No. 12636

IN THE SUPREME COURT OF THE STATE OF MONTANA

1974

---

ARTHUR J. ATCHESON,

                Plaintiff and Respondent,

-vs-

SAFECO INSURANCE COMPANY and
GENERAL INSURANCE COMPANY OF AMERICA,

                Defendant and Appellant.

---

Appeal from:  District Court of the Second Judicial District,
              Honorable John B. McClernan, Judge presiding.

Counsel of Record:

    For Appellant:

        Loble, Picotte, Loble, Pauly & Sternhagen, Helena, Montana
        Gene Picotte argued and Carter Picotte argued,
         Helena, Montana
        Henningsen, Purcell and Genzberger, Butte, Montana.
    For Respondent:

        Corette, Smith and Dean, Butte, Montana
        R. D. Corette, Jr argued and Gerald R. Allen argued,
        Butte, Montana
        ~~Henningsen, Purcell and Genzberger, Butte, Montana~~

---

                        Submitted:  September 10, 1974

                          Decided:  OCT 22 1974

Filed: OCT 22 1974

                              _Thomas J. Kearney_
                                        Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

This is an appeal by the two appellant insurance companies from a partial summary judgment ordering the two insurance companies to provide a defense for respondent Atcheson in an action pending in the United States District Court for the District of Alaska.

The two insurance companies, hereinafter referred to as Safeco, are the insurer of respondent Atcheson on policies issued on his business of being a taxidermist. The respondent's place of business is located in Butte, Montana. His business operations are worldwide. His deposition indicates that animals are sent to him from hunters from various parts of the world because of his reputation and expertise as a taxidermist built up over a period of more than 15 years. He has traveled widely particularly in Africa, and he has established business connections and friendships with various Safari Companies on that continent and particularly in the country of Zambia.

As a result of these business connections in Zambia, a hunter from Alaska, Murray Clark, was referred to him as a taxidermist. It would appear from the deposition that one of Clark's lifetime dreams was to go to a warmer climate to hunt and kill, among other animals, a prime, old, heavy-maned trophy lion. In 1970 Clark fulfilled his lifelong ambition and went to Zambia where he killed what is described in his complaint, "a prime, old, heavy-maned, trophy lion". In addition he shot a buffalo, an eland, an oribi, a waterbuck, a leche, a sable, and a warthog. All of these trophy animals were sent to the respondent to be mounted or processed by his taxidermy business.

What happened thereafter is described by the appellants as "bizarre". The various trophy animals were shipped to this country in several shipments, all of which were opened and handled

by customs before being forwarded to the respondent. Few of the items appeared to have been labeled as Clark's but were assumed to be, by the respondent, due to the fact they came from Zambia and were the type of animals claimed by Clark. By the time some of them were mounted and forwarded to Clark in Alaska, a dispute arose with Clark who claimed, among other things, that he got the wrong lion. He alleged it was smaller, less well maned than the one he shot. Too, that the eland horns were the wrong horns. The dispute resulted in the filing of a cause of action in Alaska against the respondent and upon being served with a summons and complaint in Butte, the respondent immediately turned to his insurance companies for a defense. Among other allegations of the complaint it was alleged that the respondent did not comply with his agreement to mount nine trophy animals, that they were improperly shipped by him, that some of the trophys were not his and that the respondent has improperly handled, lost or destroyed some of the trophys.

The respondent did business with appellants through their agents in Butte. The deposition indicated that prior to the difficulty above referred to the respondent had the appellants' agent come to his place of business where he showed them through the business, explained its operations and that these agents put together a voluminous policy covering what they thought was what was needed to cover the operations of the business. The respondent in his deposition stated that he told them: "Don't tell me what I have, tell me what I don't have and I'll buy it." The policy sold was a "liability policy" and it contained a "Bailees Customers Laundries and Dry Cleaners Form". We direct our attention to Section II of the Policy, which is the liability portion of the policy, and to the above "Bailees Customers Laundries and Dry Cleaners Form" to ascertain whether or not there was a

- 3 -

duty of Safeco under the blanket policy to defend the respondent. The provisions of same are hereinafter set forth:

Section II, the Blanket Liability portion of the policy begins its first paragraph as follows:

> "The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence. <u>The company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent,</u> and may make such investigation and settlement of any claim or suit as it deems expedient. The company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements."

The "Bailees Customers Laundries and Dry Cleaners Form" reads:

> "1.  COVERAGE: This form covers on all goods or articles accepted by the insured for cleaning, renovating, pressing, dyeing, repairing or laundering, the property of his customers, while contained on the premises occupied by the insured, or in the custody of his agents or branch stores, provided these locations are scheduled or endorsed hereon, and while being transported to and from the premises of his customers or branch stores or agents.
>
> "2.  ADJUSTMENT AND PAYMENT OF PREMIUMS. The premiums for insurance under this form shall be computed by applying the rates shown in the declarations. Premiums so computed shall be due and payable on or before the tenth day of each month for the preceding month.
>
> "3.  THIS FORM INSURES, except as hereinafter provided, against direct loss or damage caused by:
>
> > "(a) Fire, arising from any cause whatsoever, including lightning;
> >
> > "(b) Explosion, whether or not fire ensues;
> >
> > "(c) Accidental collision of the vehicle on which the property is carried, with any other vehicle or object, including the overturning of the vehicle, or collapse of bridges;
> >
> > "(d) Tornado, cyclone or windstorm, including

- 4 -

any loss or damage that may occur from hail, rain, sleet, or snow, whether or not driven by wind;

"(e) Earthquake;

"(f) Sprinkler leakage;

"(g) Flood, meaning thereby the rising of navigable waters;

"(h) Theft, burglary and hold-up;

"(i) Strikes, riots and civil commotion;

(j) Water damage (meaning the accidental discharge, leakage or overflow of water or stream from the plumbing system, overhead tanks, steam or hot water heating pipes, including radiators, standpipes for fire hose, sprinkler system or by bursting steam or water pipes, boilers or tanks within the premises);

"(k) Smoke damage directly caused by the breakdown or faulty operation of the fuel burning equipment used in connection with steam boilers, hot water boilers, or heating apparatus;

"(l) Transportation risks by public carriers or mail service;

"(m) Aircraft or vehicles;

"(n) Confusion of goods resulting from any of the foregoing perils.

G.R.
"4. THIS FORM DOES NOT INSURE          NON MONEY
                                By (Signature not legible)
"(a) Accounts, bills, deeds, currency, evidences of debt, money, notes, securities;

"(b) Theft by any person in the service or employment of the insured, whether or not occurring during the hours of such service or employment;

"(c) Theft of goods or packages left on delivery vehicles overnight, unless locked in insured's private garage or building occupied by insured;

"(d) Loss or damage to goods while in the custody of other dyers, cleaners and pressers, or laundries unless specifically endorsed hereon;

"(e) Loss, if at the time of loss or damage there be any other insurance covering

against risks assumed by this form
which would attach if this insurance
had not been effected;

"(f) Loss of or damage resulting from mis-
delivery or careless destruction of goods
or other unaccountable loss where there
is no evidence that the loss or damage
was occasioned by the perils specific-
ally insured against;

"The policy or supplemental endorsement exclusions
apply in addition to those listed above.

"SPECIAL CONDITIONS:

"(a) Goods accepted for storage on which a
cleaning charge has been or is to be made
are insured only while in process of
cleaning or laundering or while in trans-
portation by the insured between its plant
or branch stores or its agencies or
customers.

"(b) The company shall be liable and shall pay
to the insured the customary charges that
have been earned on any lost or damaged
goods.

"(c) The insured agrees that all thefts for
which claims are made under this form
will be reported promptly to the police
department.
                    "EFFECTIVE:   4-7-70"

The appellant denied liability asserting that neither of

the two counts of respondent's complaint states a claim upon

which relief could be granted, denied the respondent a defense

in the Alaska cause of action and plead six affirmative defenses

in its answer.

The issue before the Court is whether or not the lower

court erred in granting a partial summary judgment against the

appellants ordering them to defend the respondent in the Alaska

suit.

The appellant relies on several contentions stressing two

in particular. One, that the insurance companies are entitled

to fair consideration and should not be prejudiced because they

are insurance companies. As to this contention we find "merit"

and will not further discuss same. Two, while they concede that

- 6 -

the Alaska complaint indicates that certain goods (trophys)
were accepted by respondent for taxidermy purposes, and some were
transported by public transportation to Clark in Alaska, that
nevertheless the coverage is strictly limited by paragraph 3
and that the only risk insured against is some direct loss or
damage caused by one of the enumerated perils (a) through (n),
and that there was no allegation in the complaint of any direct
loss or damage caused by any of the enumerated perils or risks.
We find no merit to this contention.

Considering the allegations of the Alaskan complaint and
the relevant portions of the Safeco policy we find the trial court
did not err in its conclusion ordering Safeco to defend in the
Alaska litigation.

It is to the allegations of the Alaskan complaint that we
look to determine whether or not there is a duty to defend. The
appellant has a duty to defend where the complaint sets forth
facts which are a part of the covered risk. The rule on the duty
to defend is set forth in 50 A.L.R.2d 506-7:

> "Where a complaint alleges facts which represent
> a risk outside the coverage of the policy but
> also avers facts which, if proved, represent a
> risk covered, the insurer is under a duty to
> defend. * * * (Cases cited.)"

Here, while the Alaskan complaint isn't a textbook model, it does
allege that the respondent breached his agreement with Clark in
that it alleges that respondent either misplaced, destroyed or
otherwise mishandled Clark's trophys.

Section II of the Safeco policy provides for liability
insurance and must be considered in determining the duty to defend.
This policy was sold covering a 3 year period and was effective
as concerns the various acts complained of by Clark. Too, Section
II includes an additional declaration dated April 17, 1970, and
this declaration with the heading "Description and Location of

- 7 -

Insured Property" has typed upon it the words, "Bailees Customer". The first page of the "Bailees Customers Endorsement" contains the following language with respect to the coverage.

> "1. COVERAGE: This form covers on all goods or articles accepted by the insured for <u>cleaning, renovating, pressing, dyeing, repairing</u> or <u>laundering, the property of his customers</u>, while contained on the premises occupied by the insured, or in the custody of his agents or branch stores, provided these locations are scheduled or endorsed hereon, and <u>while being transported to and from the premises</u> of his customers or branch stores or agents." (Emphasis supplied.)

Clark's complaint alleging that the respondent misplaced, destroyed or mishandled the trophys either on the premises or in making improper shipments are risks contemplated in the coverage. In addition, it should be noted that the "Bailee Customers and Laundries and Drycleaners Form" sold to respondent after consultation with the appellants' agents provides:

> "3. THIS FORM INSURES, except as hereinafter provided, against direct loss or damages caused by:
>
> " * * *
>
> "(l) Transportation risks by public carriers or mail service;
>
> "(m) Aircraft or vehicles;
>
> "(n) Confusion of goods resulting from any of the foregoing perils."

Taking these words of the agreement and relating them to the subject matter about which the parties contracted it is obvious that they contracted with respect to respondent's business and not some unrelated business. See Park Saddle Horse Co. v. Royal Indem. Co., 81 Mont. 99, 261 P. 880; Independent M. & C. Co. v. Aetna L. I. Co., 68 Mont. 152, 216 P. 1109.

Despite appellants' argument to the contrary there are elements of ambiguity in the policy. The additional declaration and Bailee Customers Endorsement relate to the liability section of the policy, but the Bailee Customers Endorsement form relates

to the Laundry and Dry Cleaning business not the taxidermy business. When an ambiguity arises as noted above the insured is entitled to the benefit of any doubt. This Court in Eby v. Foremost Insurance Co. 141 Mont. 62, 66, 374 P.2d 857, provided the rule for the construction of an ambiguous insurance policy:

> " * * * But if the terms of the policy are ambiguous, obscure, or open to different construction, the construction most favorable to the insured or other beneficiary must prevail. That general rule applies with particular force to an ambiguous or doubtful provision of a policy or in an endorsement attached thereto which attempts to exclude from coverage liability in certain circumstances."

See also Johnson v. Equitable Insurance Co., 142 Mont. 128, 381 P.2d 778; St. Paul Fire & Marine Ins. Co. v. Thompson, 150 Mont. 182, 433 P.2d 795.

The appellant argues several affirmative defenses which we find are without merit. Despite Safeco's contention to the contrary the Alaska complaint does allege facts within the perils enumerated entitling the respondent to a defense by the appellants. We are not here concerned, nor was the trial judge with the outcome of the cause in Alaska for it may well be that Safeco is not liable for the alleged losses. The relevant consideration here is that on its face the complaint clearly alleges matters within Safeco's responsibility; and, the district court properly granted a partial summary judgment directing Safeco to defend.

The judgment of the district court is affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

- 9 -